EDWARD J. LOYA, JR. (SBN 257346)
loya.edward@dorsey.com
KENT J. SCHMIDT (SBN 195969)
schmidt.kent@dorsey.com
BENJAMIN YAGHOUBIAN (SBN 292318)
yaghoubian.benjamin@dorsey.com
JAYCIE J. CRUZ (SBN 352494)
cruz.jaycie@dorsey.com

DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone: (714) 800-1400
Facsimile: (714) 800-1499

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OEGG, INC., OEGG TEXAS FOODS, INC., HUNAN HUXIANGGONG FOOD CO., LTD.<br><br>Plaintiffs,<br><br>vs.<br><br>PIERCE EGG CO. d/b/a/ CHINO VALLEY RANCHERS, CHRISTOPHER NICHOLS, MARIO MONTENEGRO, DAVID WILL, GEORGE HAND PRODUCT INC., GEORGE CHEN,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DTSA**<br>**(2) MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE UTSA;**<br>**(3) BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY;**<br>**(4) AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AND DUTY OF LOYALTY;**<br>**(5) VIOLATION OF UNFAIR COMPETITION LAW**<br><br>**JURY DEMANDED** |

Plaintiffs Oegg, Inc. ("Oegg"), Oegg Texas Foods, Inc. ("Oegg Texas"), and Hunan Huxianggong Food Co., Ltd. ("HHFC") (collectively, "Oegg"), by and through their counsel, Dorsey & Whitney LLP, bring the following actions against Defendants Pierce Egg Company d/b/a Chino Valley Ranchers ("Chino Valley Ranchers" or "CVR"), Christopher Nichols, Mario Montenegro, David Will, George Hand Product Inc. ("George Hand"), and George Chen (collectively, "Defendants").[1]

## INTRODUCTION

1. Boiled eggs are a popular part of many cuisines around the world. What is commonly known as "hard-boiled eggs" accompany a variety of dishes in restaurants as well as in the "street food" of many cultures. Despite their popularity, traditional hard-boiled eggs have several limitations, including preservation, packaging, and consistency. For example, traditional hard-boiled eggs contain a yolk that many consumers find dry and chalky, which can be difficult to eat.

2. Consumers are attracted to an egg with a softer yolk with a more desirable consistency for consumers, *i.e.*, a soft-boiled egg. Oegg set out to address this consumer need. Oegg spent substantial time and energy through its research and development of novel techniques to prepare and bring its innovative and sought-after soft-boiled eggs to the market in China—and more recently, to introduce this product to the U.S. market. Oegg's innovation in this area entails processes and techniques that are highly confidential and comprise Oegg's trade secrets.

3. In 2024, Oegg met Defendants at a trade show. Defendants expressed their interest in partnering with Oegg to work together. The initial contact evolved into a relationship that was not merely prospective but entailed Defendants working with Oegg to pitch Oegg's ideas to potential investors and customers, including working together at a later trade show as a unified venture.

4. Based on that trust and believing that Defendants were acting in good

[1] Plaintiffs' allegations as to Defendants and any third parties are on information and belief.

faith to continue advancing the partnership, Oegg entrusted Defendants with confidential and proprietary information after obtaining assurances that it would be treated as such and used only for purposes of the joint efforts.

5. Defendants have now violated those obligations to Oegg by embarking on a deliberate plan to launch a competing product and misappropriating Oegg's confidential information and trade-secret protected information for Defendants' own benefit and to Oegg's detriment. Defendants' conduct gives rise to the causes of trade secret misappropriation in violation of the Defend Trade Secrets Act and California's Uniform Trade Secrets Act, breach of fiduciary duty and duty of loyalty, aiding and abetting the breach of fiduciary duties and loyalty, and unfair competition.

## PARTIES

6. Plaintiff Oegg, Inc. is a corporation organized under the laws of the state of Texas, with its principal place of business in Corsicana, Texas.

7. Plaintiff Oegg Texas Foods, Inc. is a corporation organized under the laws of the state of Texas, with its principal place of business in Corsicana, Texas.

8. Plaintiff Hunan Huxianggong Food Co., Ltd. is a corporation organized under the laws of China, with its principal place of business in Changsha, Hunan Province, China.

9. Defendant Pierce Egg Company is a corporation organized under the laws of the state of California, with its principal place of business in Colton, California. Pierce Egg Company conducts business as "Chino Valley Ranchers."

10. Defendant Christopher Nichols is an individual residing in Upland, California. Nichols is the Chief Executive Officer of CVR.

11. Defendant Mario Montenegro is an individual residing in Phoenix, Arizona. Montenegro is the Chief Operating Officer of CVR.

12. Defendant David Will is an individual residing in Murrieta, California. Will is the General Manager of CVR.

13. Defendant George Hand Product Inc. is a corporation organized under

the laws of the state of California with its principal place of business located in San Jose, California.

14. Defendant George Chen is an individual residing in San Jose, California. Chen is the owner of George Hand.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and § 1338 because this dispute concerns the rights of parties under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836 *et seq*.)

16. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367 to the extent that one or more of the state law claims asserted herein is related to the same controversy that gives rise to the federal claim, specifically Defendants' access, copying, and unauthorized use of materials obtained from Oegg, which also give rise to the federal cause of action.

17. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and no Plaintiff is the citizen of the same state as any Defendant.

18. This Court has personal jurisdiction over Defendants CVR, Nichols, Will, George Hand, and Chen because, upon information and belief, each is a citizen of California.

19. This Court has personal jurisdiction over Defendant Montenegro. Montenegro has, and continues to have, continuous and systematic business contacts with the State of California, including through his employment and affiliation with CVR. Montenegro has purposely availed himself of the benefits and protections of the State of California by conducting business in this judicial district.

20. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(b) for at least the reasons set forth above, including because a substantial part of Defendants' acts giving rise to this dispute occurred within this judicial district in California.

## FACTUAL ALLEGATIONS

### A. Oegg

21. Oegg is a pioneer in the food industry, bringing its innovative ready-to-eat soft-boiled eggs to consumers around the world. Oegg's products are the result of considerable research and development.

22. Oegg was founded by Mr. Wu Xiang. Mr. Xiang has over 15 years of experience in the egg industry, building successful food enterprises specializing in boiled quail and chicken eggs. These product offerings were novel and unique, and Oegg innovated them from the start to finish. The result of this hard work and innovative techniques was a product that was healthy, convenient, and appealing to many consumers. Consumers of Oegg's products want convenient, healthier, protein-rich, affordable, ready-to-eat food options. These consumers come from a broad base, including ranging from children to adults. One of the things that sets Oegg apart from would-be competitors is Oegg's ability to deliver industrialized, peeled, packaged, ready-to-eat eggs with a stable shelf life. Oegg's success is substantially attributable to its consumer research, product-positioning experience, innovation in shelf-life and packaging, and market-education experience. This includes the production process, equipment integration, packaging, yield control, and commercialization. Following this success, Mr. Xiang set out to bring his innovative boiled-egg products to new markets, including the United States. Mr. Xiang founded Oegg, Inc. and Oegg Texas Foods, Inc., investing significant time and resources in expanding his company to the U.S. market.

23. Since its inception, Oegg has expended significant resources, time, and effort to develop its products. Oegg's proprietary processes, know-how, and industry knowledge constitute its confidential information and valuable trade secrets.

24. Oegg's confidential information and trade secrets include at least the following categories of information:

(a) Egg specifications;

(b) Cooking, cooling, and peeling techniques;

(c) Confidential information relating to flavor;

(d) Packaging and preservation techniques;

(e) Food safety techniques and information;

(f) Manufacturing and processing information;

(g) Quality control techniques;

(h) Industry, market, and commercial information, strategy, and know-how.

25. Oegg is the rightful owner of the confidential information and trade secrets at issue in this case, all of which derive independent economic value from not being generally known or readily ascertainable to the public through proper means and have, at all relevant times, been subject to reasonable efforts and measures to keep the information secret.

26. At all relevant times, Oegg took reasonable measures to keep its confidential and trade secret information secure. Mr. Xiang initiated strict guidelines to prevent proprietary information from being exposed to outsiders at the company's factories. No suppliers or vendors were permitted to freely enter the workshop. If a visitor was approved for special entry, they would be accompanied by a full-time escort to prevent photography, filming, or movement outside of the authorized areas. Oegg restricted private-label production to protect confidentiality, limiting third-party vendors' informational access so as to not disclose Oegg trade secrets.

27. Oegg used appropriate labeling on its documents to identify them as confidential, including branding and watermarks with labels like "CONFIDENTIAL – TRADE SECRET."

28. Where circumstances called for partners, vendors, or third parties to access Oegg's confidential information or trade secrets, Oegg made clear the information was protected and ensured the other parties understood, respected, and

agreed to treat the information accordingly.

29. Consistent with these policies and practices, as further alleged below, Mr. Xiang explained to Defendants the confidentiality requirements and restrictions that would apply to the parties' anticipated discussions and collaboration and obtained their verbal agreement before providing access to confidential or trade secret material.

**B. Oegg's Introduction to Defendants**

30. Mr. Xiang attended the 2024 Winter Fancy Food Show in Las Vegas, Nevada.

31. On January 22, 2024, at the Winter Fancy Food Show, Mr. Xiang met Defendants Montenegro and Will, both of whom were acting as agents of the CVR Defendants.[2]

32. Because Oegg was building the first industrial-scale soft-boiled egg factory in the United States, Mr. Xiang asked Defendants Montenegro and Will about CVR's capabilities to supply fresh eggs for Oegg's business. At or around this time, Mr. Xiang discussed with Defendants their ability to supply approximately 3 million eggs for Oegg's use in production. Those conversations led to an introduction to George Chen, a bilingual individual fluent in English and Chinese, who was also attending the Winter Fancy Food Show.

33. Due to a language barrier, Mr. Xiang communicated to the CVR Defendants through Chen. Over the course of their relationship, Chen referred to Nichols as his "partner," "boss," and "colleague." At all relevant times, the George Hand Defendants were acting on behalf of the CVR Defendants.

34. Before establishing a relationship with Oegg, Defendants did not have experience, expertise, and industry know-how that Oegg possessed. This was demonstrated by questions Defendants posed to Oegg. In one such instance, Chen

[2] Defendants CVR, Nichols, Montenegro, and Will are collectively referred to as the "CVR Defendants." Defendants George Hand and Chen are collectively referred to as the "George Hand Defendants."

asked Mr. Xiang why Oegg did not just ask a U.S. plant to produce the Oegg products for Oegg in the United States. This demonstrates that Defendants were unaware of the process required for commercial production and the fact that it was not readily available in the United States before Oegg introduced it. This marked the beginning of a period in 2024 during which Defendants repeatedly asked Oegg for the details of Oegg's processes and techniques under the guise of partnership and collaboration.

35. On January 23, 2024, Chen asked Mr. Xiang for product samples and catalog materials on behalf of CVR, which Mr. Xiang provided him based on Chen's agreement to keep these materials confidential.

36. On January 24, 2024, Chen requested additional samples on behalf of CVR. During this discussion, Mr. Xiang explained that Oegg intended to open a factory in the United States. CVR, through Chen, told Mr. Xiang that CVR could help with site selection and regulations, and offered a deeper cooperation, including partnership on a production line together in the United States. Given CVR's apparent familiarity with applicable U.S. laws and regulations, Mr. Xiang became convinced CVR was a worthy candidate as a potential business partner or collaborator.

37. On or around January 28, 2024, Mr. Xiang met with Chen in his office in San Jose, California. During this meeting, Mr. Xiang informed Chen that Oegg's equipment and manufacturing process included confidential information and trade secrets. Chen agreed and acknowledged during this meeting that there were no existing facilities in the United States geared toward producing the soft-boiled products that Oegg had developed. Chen stated that he could help Oegg with selecting a site for Oegg's facility in the United States.

**C. Changsha Visit**

38. On or around March 20, 2024, Chen stated that he and CVR employees, including Nichols and Montenegro hoped to visit Changsha, China, where Oegg has facilities. Mr. Xiang understood that this visit was in furtherance of a prospective business relationship and partnership between Oegg and Defendants. At Chen's

request, Mr. Xiang arranged for Oegg to make hotel accommodations for the visit on May 3, 2024.

39. On or around April 10, 2024, Chen stated that the purpose of the Changsha trip was for Nichols to learn more about Oegg's soft-boiled egg product, Oegg's U.S. factory needs, and Oegg's production-related processes. Oegg agreed to host Defendants' travel to China and factory tour because Oegg reasonably believed that Defendants were acting with Oegg in partnership and collaboration on a joint venture.

40. On or around May 3, 2024, four representatives from CVR and George Hand, including Nichols, Montenegro, Chen, and an additional representative named Chen Ruizhang (hereafter "Ruizhang"), arrived in Changsha to visit Oegg's facility.

41. On May 4, 2024, the CVR and George Hand representatives arrived at Oegg's Changsha factory where they met with Mr. Xiang. Mr. Xiang emphasized that the workshop was fully confidential and normally closed to outsiders, explaining that their visit was an exception based on the belief that the parties would collaborate to advance Oegg's U.S. venture.

42. Mr. Xiang explained the confidentiality requirements and restrictions that would apply to the parties' anticipated discussions and collaboration. Each visitor verbally agreed to the confidentiality terms before receiving access to Oegg's confidential spaces and materials.

43. Below is a photo of the four visitors with Mr. Xiang (from left to right, Ruizhang, Nichols, Mr. Xiang, Montenegro, and Chen):



44. During this meeting, Mr. Xiang provided more information about plans to build the first industrial-scale soft-boiled egg factory in the United States, believing that the information would be used solely in connection with a prospective partnership. Mr. Xiang also provided confidential information regarding Oegg's industrial process for manufacturing soft-boiled egg products, including the overall process flow, the sequencing and relationship of stages of production, confidential know-how regarding the selection process and production line, process-control considerations, and the know-how for taking raw eggs and outputting a finished product. Mr. Xiang explained that this information had been developed and refined through Oegg's hard work, research, and development.

45. At the May 4, 2024, meeting, Mr. Xiang also shared confidential information and trade secrets regarding Oegg's equipment, including the configuration, functions of various pieces of equipment, their arrangement within the line, and how they work together as an integrated industrial production solution.

46. By this visit, the parties' relationship had already become solidified as an actual express or implied partnership. While Mr. Xiang understood that the

formalities of the relationship would require further steps including formal agreements, he reasonably understood by Defendants' words and actions, including during the visit, that Oegg and CVR were in an existing, not merely prospective, partnership, venture and collaboration.

47. Mr. Xiang entrusted the Defendants with confidential information (as alleged below) solely based on that understanding.

48. On or around May 13, 2024, Chen asked Mr. Xiang if he would be willing to set up a small prototype in the CVR facility to test production. Although Mr. Xiang did not understand the true reason for Defendants' request at the time, Defendants' recent conduct confirms that Defendants' request was an attempt to obtain a working version of Oegg's proprietary technologies and trade secrets.

### D. Further Discussions Regarding Site Selection in the U.S.

49. On May 6, 2024, confirming that the parties' relationship moved to an actual or implied partnership, Nichols conveyed to Mr. Xiang that Defendants shared a vision for a joint business venture in the United States and looked forward to supporting Oegg's growth in that market.

50. Later in May 2024, Chen proposed a joint line between Oegg and CVR where Oegg would be a major shareholder of the business. The parties discussed a follow-up meeting to be held in Los Angeles.

51. In June 2024, the parties exchanged emails regarding potential sites for a factory as well as planning for the soft-boiled egg line, all consistent with work on the joint venture relationship that existed at least by that point in time.

### E. 2024 Summer Fancy Food Show

52. The parties attended the 2024 Summer Fancy Food Show in New York City on or around June 23-25, 2024. Oegg attended this trade show because it was an important event at which to meet potential customers and possibly investors for the venture.

53. CVR sent Defendants Chen and Montenegro to the event. They wore

clothing identifying them as affiliated with Oegg and worked out of Oegg's booth.

54. Chen and Montenegro interacted with Oegg's potential customers (buyers) at the Oegg booth. Mr. Xiang relied on Chen to translate for him at this event and others.

55. The parties presented themselves jointly at this event under Oegg's brand, with Chen wearing Oegg apparel and presenting Oegg products to potential customers and investors who visited Oegg's booth. The images below show Chen and Montenegro with Mr. Xiang in Oegg's booth, wearing Oegg branded t-shirts and event identification tags representing to others that they were there as representatives of Oegg.[3] The still images below (and the video from which they were excerpted) show Chen and Montenegro actively involved in promoting Oegg's proprietary products.




56. During that event, Chen presented Oegg's proprietary product to consumers, investors, and social media. Among other things, Chen described the product as "very unique" and "one of a kind."

[3] https://www.tiktok.com/@chefgeorgeduran/video/7384230198226521390?_r=1&_t=ZT-95cSEyG3Mv0




57. During the June 2024 Food Show, the parties strategized on how best to market Oegg's business model and products and how to best present Oegg to the general public at the Food Show (in the photo from left to right, prospective investors, Mr. Xiang, and Chen).



58. During the parties' discussions at the New York Fancy Food Show, Defendants continued to access more of Oegg's confidential information and trade secrets, including information intended for potential investors. Oegg would not have allowed access to this information but for its belief that Defendants were acting in good faith consistent with the partnership that had been formed.

**F. July Los Angeles Visit**

59. On or around July 3, 2024, the parties met in Los Angeles to further discuss the relationship that had been formed. During this meeting, the parties reaffirmed their mutual intent to continue operating in partnership with one another and discussed ways to formalize their relationship in written agreements.

60. The parties agreed and understood that they had a joint interest in undertaking the selection of a site for a facility to produce a boiled-egg product for the U.S. market.

61. During this meeting, Mr. Xiang provided more detail about Oegg's proprietary soft-boiled equipment line, and in particular the process for peeling the eggs. He also shared with Defendants details about machine fabrication, tuning logic, and frontline production data. The information shared at this meeting was subject to the Defendants' agreement to the confidentiality terms that Mr. Xiang had provided to each Defendant.

62. Defendants' conduct up through and including this meeting, including visiting Changsha, China, discussing site selection in the United States, attending the Summer Fancy Food Show under Oegg's exhibitor arrangement, made Oegg's leadership believe that Defendants were cooperating with Oegg in good faith.

63. In the months that followed this meeting, Defendants halted progress on the parties' joint efforts they had already undertaken. Despite what appeared to Oegg to be a robust partnership and collaboration up until this point, Defendants stalled and did not continue advancing the collaboration. As recounted below, Defendants' subsequent conduct confirmed that they did not act in good faith.

**G. Oegg's U.S. Facility**

64. In November 2025, Oegg acquired a 100,000 square-foot facility in Corsicana, Texas. This acquisition was part of a tens-of-millions of dollars investment in Oegg's U.S. manufacturing project.



65. Oegg strategically selected this facility based on multiple considerations, including information regarding regulatory, infrastructure, and growth needs.

**H. Defendants' Breach**

66. Consistent with the above, Defendants owed duties to Oegg, including duties to account to the partnership, to refrain from dealing adversely, and to refrain from competing with the partnership, including in accordance with California Corporation Codes section 16404.

67. Defendants violated their duties by circumventing Oegg and the obligations they owed to Oegg and instead launching a soft-boiled product under the Chino Valley Ranchers brand that is adverse to and competes with Oegg's ongoing business.

**I. Oegg Learns of Defendants' Misconduct**

68. After the parties' discussions and after Oegg shared its confidential

information and trade secrets with Defendants, Defendants stopped substantively communicating with Oegg. Defendants attributed the delay to needing more time to evaluate how to proceed.

69. The parties attended Natural Products Expo West, which was held from March 3-6, 2026, in Anaheim, California. CVR had its own booth at Expo West. At least Nichols and Montenegro attended.




70. At Expo West, CVR introduced a competing product that was developed using the confidential and trade secret information that it learned from Oegg. Before this March 2026 event at Expo West, CVR never informed Mr. Xiang or Oegg that CVR was developing a competing product; nor was Mr. Xiang aware that CVR planned to attend this event.

71. The CVR Defendants documented their conduct on social media, showing introduction of products developed using Oegg's confidential information and trade secrets.





72. As shown in the accompanying images, Nichols personally participated in the launch of CVR's competing product. At Expo West, Nichols was asked about the soft-boiled egg product presented. Nichols stated that the soft-boiled egg was prepared through a "boiling process—boiling and chilling." One of the attendees at Expo West remarked that they were only familiar with this type of egg in Asia. Nichols acknowledged this and further stated: "We're trying to bring that to America. We're the first – first ones to do it here domestic." At the same event, Nichols stated

that Defendants had been to China. Nichols stated: "Yes, we went to see how they do it. We went to – we did a lot of research in Taiwan, China, and Japan – and we bring it back." In the same conversation, Nichols stated: "We went to Changsha," referring to Defendants' confidential visit of Oegg's secure facility where Defendants obtained Oegg's confidential information and trade secrets.

73. Defendants' conduct and statements corroborate that Defendants visited Oegg's Changsha facility and used that information to launch a competing product to Oegg. By obtaining Oegg's confidential information and trade secrets, Defendants improperly obtained a head start that allows Defendants to bypass the years of research, development, and innovation Oegg undertook. Defendants took this shortcut to their benefit and Oegg's detriment. Nichols' misleading claim about being first to introduce the product in the United States demonstrates the ongoing irreparable harm Defendants are causing to Oegg by interfering with Oegg's rightfully-gained first mover advantage.





74. Defendants have doubled down on their unlawful campaign by promoting the misappropriated "Jammy Egg" product in public expos and on social media, including most recently on April 16, 2026.




75. Defendants' social media campaign shows their deliberate and systematic attempts to leverage their wrongful conduct, including misappropriation of Oegg's trade secrets, hijacking Oegg's opportunities and first-mover advantage.




76. In or around May 2026, Oegg learned that Defendants are preparing to bring their misappropriated Jammy Egg product to market on a larger scale through Vesta Foodservice. *See* https://www.facebook.com/vestafoodservice/posts/were-excited-to-share-the-newest-addition-from-chino-valley-ranch-dark-yolk-soft/1428628882607305/. Also in or around May 2026, Oegg learned that Defendants are seeking to launch their misappropriated Jammy Egg product for sale at stores including Trader Joe's in or around July 2026.

77. Defendants' own statements and conduct corroborate that Defendants visited Oegg's Changsha facility and used that information to launch a competing product to Oegg. Nichols' misleading claim about being first to introduce the product in the United States demonstrates the ongoing irreparable harm Defendants are causing to Oegg by interfering with Oegg's rightfully-gained first mover advantage.

78. At no time did Defendants have permission to use or disclose Oegg's confidential information and trade secrets in the manner alleged herein.

**<u>First Cause of Action</u>**

**(All Defendants)**

**Violation of the Defend Trade Secrets Act**

**(18 U.S.C. § 1836, *et seq.*)**

79. Oegg re-alleges and incorporates all of the allegations set forth in the

preceding paragraphs as if fully set forth herein.

80. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, gives owners of trade secrets a legal right to file a lawsuit in federal court when their trade secrets have been stolen or misappropriated. 18 U.S.C. § 1836(b).

81. Under the DTSA a "trade secret" includes all forms any types of financial, business, technical, economic, or engineering information including plans, compilations, designs, methods, techniques, processes, procedures, programs, or codes, etc., whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if the information derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information and the owner of the trade secret has taken reasonable measures to keep such information secret. 18 U.S.C. § 1839(3).

82. Under the DTSA, misappropriation occurs when the trade secret has been disclosed or used without express or implied consent by a person who knew or had reason to know that the knowledge of the trade secret arose under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to maintain its secrecy or limit its use. 18 U.S.C. § 1839(5).

83. Oegg maintains confidential information regarding its valuable processes and techniques that constitute trade secrets. Oegg's trade secrets are integral to its business, and they have significant independent economic and commercial value to Oegg or any other party who would seek to compete with Oegg. Oegg's trade secrets are related to its products and offerings that are used in or intended for use in interstate and foreign commerce.

84. Defendants misappropriated Oegg's trade secrets by using that information to develop CVR's competing Jammy Egg line.

85. As a direct and proximate result of Defendants' use of Oegg's trade

secrets, Oegg has and continues to suffer damages in an amount to be proven at trial.

86. Defendants took the actions alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Oegg, and acted with an improper and evil motive amounting to malice and in conscious disregard of Oegg's rights.

87. Because Defendants undertook the acts alleged herein in a willful, intentional, and malicious manner to injure and damage Oegg while gaining a competitive advantage for Defendants' own benefit, Oegg is entitled to recover compensatory and exemplary damages in an amount to be proven at trial, as well as statutory penalties and punitive damages.

88. Defendants' conduct has irreparably harmed Oegg, including harm to its reputation and standing in the marketplace, and Oegg is entitled to injunctive relief.

## Second Cause of Action

**(All Defendants)**

**Violation of California's Uniform Trade Secrets Act**

**(Cal. Civil Code §§ 3426, *et seq*.)**

89. Oegg re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

90. California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq*., gives owners of trade secrets a legal right to file a lawsuit when their trade secrets have been stolen or misappropriated.

91. Under the CUTSA, a "trade secret" is information that derives independent value from the fact it is unknown by others and a company has taken reasonable steps to protect the information from disclosure. Cal. Civ. Code § 3426.1(d).

92. Misappropriation has occurred under the UTSA when the trade secret is (1) acquired by a person who knows or has reason to know the trade secret was

acquired by improper means, or (2) when it is disclosed or used without consent by a person who: (A) used improper means to acquired knowledge of it; (B) knew or had reason to know that their knowledge of the information was derived through improper means, arose under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to maintain its secrecy or limit its use; or (C) before a material change of their position, knew or had reason to know the information was a trade secret and that knowledge of it has been acquired accidentally or by mistake. Cal. Civ. Code § 3426.1(b)(2).

93. Oegg maintains confidential information regarding its valuable processes and techniques that constitute trade secrets. Oegg's trade secrets are integral to its business, and have significant independent economic and commercial value to Oegg or any other party who would seek to compete with Oegg.

94. As a direct and proximate result of Defendants' use of Oegg's trade secrets, Oegg has and continues to suffer damages in an amount to be proven at trial.

95. Defendants took the actions alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Oegg, and acted with an improper and evil motive amounting to malice and in conscious disregard of Oegg's rights.

96. Because Defendants undertook the acts alleged herein in a willful, intentional, and malicious manner to injure and damage Oegg while gaining a competitive advantage for Defendants' own benefit, Oegg is entitled to recover compensatory and exemplary damages in an amount to be proven at trial, as well as statutory penalties and punitive damages.

97. Defendants' conduct has irreparably harmed Oegg, including harm to its reputation and standing in the marketplace, and Oegg is entitled to injunctive relief.

## Third Cause of Action

**(Defendants CVR and George Hand)**
**Breach of Fiduciary Duty and Duty of Loyalty Violation of Cal. Corp. Code § 16404**

98. Oegg re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

99. Under California law, a partnership is "the association of two or more persons to carry on as coowners a business for profit . . . whether or not the persons intend to form a partnership." Cal. Corp. Code § 16202(a). Additionally, an agreement to form a partnership can be 'written, oral, or implied.' Cal. Corp. Code § 16101 (10)."

100. Beginning at least by the date of the factory visit in Changsha, China (May 4, 2024), an oral and/or implied partnership existed, and was further solidified and clarified, as the parties progressed from merely prospective ideas to actually agreeing, expressly and impliedly, that they were working together to carry on as co-owners of a business.

101. The parties engaged in joint efforts, including working together at the New York show, even as the details of how their relationship would be structured were being discussed.

102. The parties owed each other certain duties, including fiduciary duties of loyalty and care codified by California Corporations Code section 16404.

103. Under California Corporations Code section 16404(b), a partner's duty of loyalty to the partnership and the other partners includes all of the following:

(a) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity.

(b) To refrain from dealing with the partnership in the conduct or

winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership.

(c) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

104. Under California Corporations Code section 16404(c), "a partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law."

105. CVR and George Hand violated their fiduciary duties to Oegg by taking opportunities for themselves that belonged to the partnership, acting adversely to the partnership, and competing with the partnership by, among other things, launching their own soft-boiled egg product.

106. As a direct and proximate result of CVR and George Hand's conduct, Oegg has been and continues to be harmed.

107. Defendants took the actions alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Oegg, and acted with an improper and evil motive amounting to malice and in conscious disregard of Oegg's rights.

108. Because CVR and George Hand acted in a shameless, despicable, deliberate, and intentional manner in order to injure and damage Oegg while gaining a competitive advantage for Defendants' own benefit, Oegg is entitled to recover compensatory damages in an amount to be proven at trial, as well as statutory penalties and punitive damages.

109. Defendants' conduct has irreparably harmed Oegg, including harm to its reputation and standing in the marketplace, and Oegg is entitled to injunctive relief.

## Fourth Cause of Action

**(Defendants Nichols, Montenegro, Will, and Chen)**
**Aiding and Abetting Breach of Fiduciary Duty and Violation of Cal. Corp. Code § 16404**

110. Oegg re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

111. CVR and George Hand owed fiduciary duties to Oegg, including a duty of loyalty and duty of care. CVR and George Hand breached those duties as set forth herein.

112. At all relevant times, each of the Individual Defendants worked closely with one another and knew that each Defendant, including CVR and George Hand, owed fiduciary duties to Oegg.

113. The Individual Defendants substantially assisted and encouraged the breaches of fiduciary duty, including causing CVR and George Hand to take opportunities for themselves that belonged to the partnership, act adversely to the partnership, and compete with the partnership by, among other things, launching their own soft-boiled egg product. The Individual Defendants had actual knowledge of the breaches of fiduciary duty because they were directly responsible for and involved in the interactions with Oegg and Defendants' conduct that was adverse to and in competition with Oegg.

114. The Individual Defendants' conduct was a substantial factor in causing harm to Oegg because they were the principals and primary decision makers for CVR and George Hand. The harm was a direct and proximate result of Defendants' conduct.

115. Because the Individual Defendants acted in a shameless, despicable, deliberate, and intentional manner in order to injure and damage Oegg while gaining a competitive advantage for Defendants' own benefit, Oegg is entitled to recover compensatory damages in an amount to be proven at trial, as well as statutory penalties and punitive damages.

116. Defendants' conduct has irreparably harmed Oegg, including harm to its reputation and standing in the marketplace, and Oegg is entitled to injunctive relief.

**Fifth Cause of Action**

**(All Defendants)**

**Unlawful, Unfair, and Fraudulent Business Practices in Violation of**

**(Cal. Bus. & Prof. Code §§ 17200 and 17203, *et seq.*)**

117. Oegg re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

118. The Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200, *et seq.*) prohibits unfair competition in the form of any unlawful, unfair or fraudulent business act or practice.

119. A court may restore to any person in interest any money or property which may have been acquired by means of such unfair competition.

120. "[A]ny person who has suffered injury in fact and has lost money or property as a result of such unfair competition" to pursue a civil action for violation of the Unfair Business Practices Act. (Cal. Bus. & Prof. Code § 17204.)

121. Defendants committed acts of unfair competition as defined by the UCL by engaging in the unlawful, unfair, and fraudulent acts and practices described herein, violating laws including but not limited to breaches of fiduciary duty as required by California Corporations Code section 16404.

122. The acts and practices described above have allowed Defendant to gain an unfair competitive advantage over Oegg.

123. Accordingly, the acts and practices described above constitute unfair, unlawful, or fraudulent business practices within the meaning of the California Business & Professions Code.

124. As a direct and proximate result of the acts described herein, Oegg has lost money or property in amount according to proof at trial.

125. As a direct and proximate result of the acts described herein, Oegg has been irreparably harmed, including harm to its reputation and standing in the marketplace, and Oegg is entitled to injunctive relief.

126. Oegg is thereby entitled to disgorgement and other remedies pursuant to the UCL.

## PRAYER FOR RELIEF

WHEREFORE, Oegg demands judgment and relief against Defendants and respectfully requests that this Court:

1. Award Oegg a money judgment, granting compensatory relief for an amount to be proven at trial, including actual damages, disgorgement, restitution, exemplary damages, and/or punitive damages;

2. Direct Defendants to return, relinquish, or destroy any materials obtained or derived from Oegg and to remove from any location under their control any materials obtained or derived from Oegg;

3. Direct Defendants to account to Oegg for profits arising from the conduct complained of herein;

4. Award Oegg its reasonable attorneys' fees, costs and disbursements of this action;

5. Award Oegg prejudgment interest at the rate provided for under California law as applicable; and

6. Award Oegg such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Oegg hereby demands that all claims or causes of action raised in this Complaint be tried to a jury to the fullest extent possible under the United States Constitution.

Dated: May 20, 2026

DORSEY & WHITNEY LLP

By: /s/ Ed J. Loya Jr.

Edward J. Loya, Jr.
Kent J. Schmidt
Benjamin Yaghoubian
Jaycie J. Cruz

*Attorneys for Plaintiffs*